**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| SOUTH ADAMS COUNTY WATER AND SANITATION DISTRICT, ON BEHALF OF ITS SOUTH ADAMS COUNTY WATER AND SANITATION DISTRICT ACTIVITY ENTERPRISE | |
| Plaintiff, | MDL No. 2873<br>Master Docket: 2:18-mn-2873 |
| v. | JUDGE RICHARD GERGEL |
| 3M COMPANY (f/k/a Minnesota Mining and Manufacturing, Co.); TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); CHEMGUARD, INC.; KIDDE PLC, INC.; KIDDE-FENWAL, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; NATIONAL FOAM, INC.; ANGUS FIRE ARMOUR CORP.; ANGUS INTERNATIONAL SAFETY GROUP, LTD.; BUCKEYE FIRE EQUIPMENT COMPANY; UNITED TECHNOLOGIES CORPORATION; CHUBB FIRE & SECURITY, LTD.; E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; ARKEMA, INC.; JOHN DOE DEFENDANTS 1-49, | Civil Case No.: 2:19-cv-3559-RMG<br><br>DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

South Adams County Water and Sanitation District, on behalf of its South Adams County Water and Sanitation District Activity Enterprise ("the District" or "Plaintiff"), by and through its undersigned counsel, as and for its complaint against the Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), Tyco Fire Products, LP (individually and as successor-in-interest to The Ansul Company), Chemguard, Inc., Kidde PLC, Inc., Kidde-Fenwal,

Inc., UTC Fire & Security Americas Corporation, Inc., National Foam, Inc., Angus Fire Armour

Corporation, Angus International Safety Group, Ltd., Buckeye Fire Equipment Company, United

Technologies Corporation, Chubb Fire & Security, Ltd., E. I. Du Pont de Nemours and

Company, The Chemours Company, The Chemours Company FC, LLC, Arkema Inc., and John

Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## I.    SUMMARY OF THE CASE

1.  Plaintiff is a special district, governed under provisions of the State of Colorado Special

    District Act[1] and organized to provide water and sanitation district services to the Commerce

    City, Colorado area and nearby unincorporated areas of Adams County, Colorado.    In

    Colorado, special districts are quasi-municipal corporations and political subdivisions.[2]

2.  As a water district, Plaintiff is responsible for supplying "water for domestic and other public

    and private purposes by any available means and provides all necessary or proper reservoirs,

    treatment works and facilities, equipment, and appurtenances incident thereto."[3]

3.  Additionally, as a sanitation district, Plaintiff is responsible for providing "for storm or

    sanitary sewers, or both, flood and surface drainage, treatment and disposal works and

    facilities, or solid waste disposal facilities or waste services, and all necessary or proper

    equipment and appurtenances incident thereto."[4]

4.  Pursuant to Colorado law, special districts are empowered to sue and to "exercise all rights

    and powers necessary or incidental to or implied from the specific powers granted to special

    districts."[5]

---

[1] C.R.S. § 32-1-101 *et. seq.*
[2] C.R.S. § 32-1-103(20).
[3] C.R.S. § 32-1-103(25).
[4] C.R.S. § 32-1-103(18).
[5] C.R.S. § 32-1-1001(1).

5. Plaintiff's service area encompasses an approximately 65 square mile area in Adams County, Colorado. Within that area, Plaintiff delivers over 2.7 billion gallons of water per year to approximately 60,000 people through over 18,000 connections.

6. Plaintiff owns and operates a water supply system that consists of, among other things, eleven drinking water wells that draw groundwater from the alluvial aquifer tributary to the South Platte River, and eight deep groundwater wells which draw drinking water from the Arapahoe, Dawson-Arkose, and Laramie-Fox Hills Formations. Plaintiff's drinking water supply comes from these nineteen wells, in addition to treated water purchased from Denver Water. Plaintiff also owns and operates a non-potable irrigation water system that is dependent on fifteen alluvial groundwater wells. In addition, Plaintiff owns and operates a wastewater treatment plant that provides wastewater treatment services to Plaintiff's customers.

7. Plaintiff owns Colorado water rights in the alluvial aquifer tributary to the South Platte River that were confirmed and awarded by decrees of the District Court, Water Division No. 1, State of Colorado. Pursuant to its water rights, Plaintiff withdraws water from its wells to supply its customers' water needs.

8. Colorado water rights are property rights that are afforded legal protection and are considered real property.[6]

9. Early in 2018, Plaintiff conducted tests for per- and polyfluoroalkyl substances ("PFAS"), including but not limited to perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), in 24 raw water samples drawn from eleven of Plaintiff's water supply wells. The range of PFAS levels detected in the raw water samples was 24 parts per trillion ("ppt") to 2,280 ppt.

---

[6] C.R.S. § 38-30-102(2).

10. Shortly thereafter, Plaintiff also tested its treated water supply and detected PFAS levels ranging from 45 ppt to 64 ppt.

11. The United States Environmental Protection Agency (EPA) has issued a Health Advisory Limit ("HAL") of 70 ppt for PFOS and PFOA, both individually and combined.

12. Because PFOS and PFOA concentrations in the raw water samples taken from some of Plaintiff's water supply wells exceeded EPA's HALs, Plaintiff had to shut down two of its water supply wells.

13. In order to continue to meet its water demands after having to shut down two of its water supply wells, Plaintiff had to increase the amount of water it took from Denver Water in the high-demand, 2018 summer season, confirm that its existing granular activated carbon ("GAC") water treatment plant could remove elevated concentrations of PFOA and PFOS, and had to accelerate the change-out schedule for GAC.

14. Blending additional Denver Water into Plaintiff's system and utilizing GAC filters for water treatment have been effective in safeguarding Plaintiff's water supply and property; however, the continuous and ongoing presence of PFAS contamination in Plaintiff's water supply requires more frequent GAC filter changes for treatment to be effective, which has resulted in increased costs to Plaintiff.  Plaintiff also had to procure laboratory analytical capabilities to allow for quick turnaround on analytical results.  All of these costs are in addition to consulting costs and legal fees necessitated by the discovery that Plaintiff's water supply is contaminated with PFOA and PFOS and the effort to identify the source or sources of PFAS entering the District's water supply.

15. As a result of this PFOA and PFOS contamination, Plaintiff has incurred, and continues to incur, costs and damages related to the PFAS contamination of its water supply and property,

including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet Plaintiff's water supply demands.

16. The impact of the PFAS contamination has required and/or will require the sampling, testing, treatment and/or filtration of Plaintiff's water system.

17. At various times from the 1960s through today, Defendants designed, manufactured, marketed, and/or sold aqueous film-forming foam ("AFFF"), a firefighting agent used to extinguish Class B flammable liquid fuel fires.

18. Defendants designed, manufactured, marketed, and sold AFFF throughout the United States, including in Colorado.

19. Defendants' AFFF contained PFAS, specifically, PFOS and/or PFOA, and/or contained the precursors to PFOS and PFOA.

20. Defendants knew, or should have known, that PFOS and PFOA are highly mobile in water, not easily biodegradable, persistent in the environment, and present significant and unreasonable risks to human health and the environment.

21. Nevertheless, Defendants manufactured, sold, and were otherwise responsible for placing AFFF products containing PFOS and/or PFOA into the stream of commerce, and for the release of these compounds into the environment, with the knowledge that PFOA and/or PFOS would be released into the environment in the course of firefighting training exercises and in firefighting emergencies.

22. As a result of Defendants' acts and omissions, these compounds entered into a critical source of water relied upon by Plaintiff and its customers, thereby contaminating Plaintiff's water supply and property.

23. As a result of the use of the Defendants' AFFF for its intended purpose, PFOS and PFOA were discharged at substantial levels into the environment at or from sites throughout the United States, including in Colorado.

24. At all times pertinent herein, Plaintiff did not know, nor should it have known, of the ongoing contamination of its property through the use of Defendants' AFFF as the Defendants did not disclose the toxic nature and harmful effects of their AFFF products.

25. As the manufacturers and sellers of PFOS, PFOA, and/or products that contain PFOS and/or PFOA, Defendants are responsible for PFOS and PFOA contaminants released into the water that Plaintiff has decreed rights to and that serves as a supply source for Plaintiff's water supply system.

26. Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for the damage to its property as a result of the continuous and ongoing contamination of its property by Defendants' PFOS and/or PFOA; and for the past and future incurred costs associated with various site-related investigations and with treatment, remediation, and monitoring activities related to Plaintiff's contaminated water supply.

## II.    PARTIES

27. Plaintiff is a special district, organized and existing under the laws of the State of Colorado, with its principal office located at 6595 E. 70th Avenue, Commerce City, Colorado 80037.

28. Plaintiff's Public Water System ("PWS") I.D. is CO0101140.

29. Plaintiff's primary source of water for its water supply systems is water from 26 wells which draw from the alluvial aquifer tributary to the South Platte River, eight deep wells which draw from the Arapahoe, Dawson-Arkose, and Laramie-Fox Hills Formations, and treated water from Denver Water.

30. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.  3M is registered to do business in the State of Colorado. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

31. 3M is the only company that manufactured and/or sold AFFF containing PFOS.

32. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.  Tyco is registered to do business in the State of Colorado.

33. Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI].

34. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco").  At all times relevant, Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

35. Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

36. Defendant Kidde PLC, Inc. ("Kidde PLC") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032.

37. Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

38. Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. UTC is registered to do business in Colorado. Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

39. Defendant National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). This Defendant manufactured and sold AFFF that contained PFOA.

40. Defendant Angus Fire Armour Corporation ("Angus Fire") is a Delaware corporation, with its principal offices at 141 Junny Road, Angier, North Carolina 27501.  Upon information and belief, Angus International is the corporate parent of National Foam and Angus Fire.

41. Defendant Angus International Safety Group, Ltd. ("Angus International") is a foreign private limited company, with offices at Station Road, High Bentham, Near Lancaster, United Kingdom LA2 7NA. Upon information and belief, Angus International is registered in the United Kingdom with a registered number of 8441763.

42. Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.  This Defendant manufactured and sold AFFF that contained PFOA.

43. Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032.

44. Defendant Chubb Fire & Security, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210.  Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls & Security, a unit of United Technologies Corporation.

45. Defendant E. I. Du Pont De Nemours and Company ("DuPont") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  DuPont is registered to do business in the State of Colorado.

46. Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.  Chemours does business throughout the United States, and is registered to do business in the State of Colorado.

47. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

48. Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and conducts business throughout the United States, including the State of Colorado.  Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

49. Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406.  Arkema, Inc. is registered to do business in Colorado.  Arkema is a manufacturer of PFAS, including PFOA.

50. Upon information and belief, Defendants John Doe 1-49 were manufacturers and/or sellers of PFOS, PFOA, and/or products containing PFOS or PFOA that are responsible for the damages caused to Plaintiff described herein. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

51. The foregoing Defendants, including the John Doe Defendants, all were manufacturers and/or or sellers of PFOS, PFOA, and/or products containing PFOS and/or PFOA, including but not limited to AFFF, who, on information and belief, manufactured, distributed, and/or sold PFOS, PFOA, and/or products containing PFOS and/or PFOA, including but not limited to AFFF, that contaminated the Plaintiff's property and water rights.

52. When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III.    JURISDICTION AND VENUE

53. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiff and Defendants and the amount in damages exceeds the minimal jurisdictional limits of this Court.

54. Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3").  Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the District of Colorado.  Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the District of Colorado as the "Home Venue" as this case may have originally been filed there.

55. Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident, the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

### IV.    FACTUAL ALLEGATIONS

A.    THE CONTAMINANTS: PFOA & PFOS

56. PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA").  PFAAs are part of the larger chemical family known as PFAS.  PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group.  The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent.

57. PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

58. PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[7]

59. According to the EPA, PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[8]

60. EPA has also warned that PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[9]

61. According to EPA, "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular,

---

[7] See EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.

[8] See EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.

[9] See EPA Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.

kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[10]

## B.   THE PRODUCT: AQUEOUS FILM-FORMING FOAM

62. AFFF is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

63. The AFFF made by Defendants contained either or both PFOA and PFOS.[11]

64. The AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS.   All other Defendants used telomerization; fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

65. AFFF can be made without PFOA and PFOS.   Fluorine-free foams do not release PFOA and/or PFOS into the environment.   Despite knowledge of this fact as well as knowledge of the toxic nature of AFFF made with PFOA and/or PFOS, Defendants continued to manufacture, distribute and/or sell AFFF with PFOA and/or PFOS which led to the ongoing contamination and damages to Plaintiff's property.

66. AFFF is used to extinguish fires, particularly those involving petroleum or other flammable liquids.   AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

67. When used as the Defendants intended and directed, the AFFF manufactured and/or sold by the Defendants released PFOA and/or PFOS into the environment.

---

[10] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos.
[11] All references to PFOS and/or PFOA throughout this Complaint include the chemical precursors to PFOS and/or PFOA.

68. Once PFOA and PFOS are released into the environment they do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and they are extremely persistent in the environment.  As a result of their persistence, they are widely distributed throughout soil, sediment, surface water and groundwater.

69. Defendants' AFFF containing PFOS and/or PFOA has been used for its intended purpose in the process of fire protection, training, and response activities within Colorado for many years.  On information and belief, AFFF was used during these activities as directed and intended by the Defendants, which allowed PFOA and PFOS to migrate from upgradient sources into Plaintiff's water supply, thereby contaminating Plaintiff's property, including Plaintiff's water supply, as well as causing other extensive and ongoing damages to Plaintiff.

70. Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to, cause injury and damage to Plaintiff and Plaintiff's property.

## C.    DEFENDANTS' KNOWLEDGE OF THE HAZARDS OF PFOA AND PFOS

71. On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS have negative environmental impacts, and (b) when sprayed, used or otherwise released into the environment per the instructions given by Defendants, PFOA and PFOS migrate into surface water and through the subsurface, into groundwater, resist natural degradation, can render drinking water unsafe and/or non-potable, and can be removed from water supplies only at substantial expense.

72. At all times pertinent herein, Defendants also knew or should have known, among other things, that PFOA and PFOS present a risk to human health, and are readily absorbed into

animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver, potentially causing severe damage.[12]

73. In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[13]

74. In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[14]

75. Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned, "we must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[15]

76. Notwithstanding their respective knowledge of the dangers of AFFF made with PFOA and/or PFOS, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or

---

[12] *See* 3M Field Letter re: Meeting with DuPont (12/5/1975), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1124.pdf; Bioassay Report: Acute toxicity of Light Water to bluegill (Lepomis marcochirus), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1095.pdf; 3M Interoffice Memo re: Fluorochemicals in Blood (11/3/1977), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1146.pdf.

[13] *See* Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[14] *See* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[15] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

sold AFFF containing PFOA and/or PFOS; (2) issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil and/or waste water disposal systems), thus improperly permitting PFOA and/or PFOS to contaminate soil, surface water and groundwater; (3) failed to recall and/or warn users of AFFF, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of soil, surface water and groundwater contamination as a result of the standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the AFFF containing PFOA and/or PFOS.

77. As a direct result of Defendants' acts alleged in this Complaint, Plaintiff's property has been contaminated, and will continue to be contaminated, with PFOA and PFOS, creating an environmental and public health hazard, unless such contamination is remediated. As a direct and proximate result, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOA and PFOS contamination of its property at significant expense, loss and damage to Plaintiff.

78. Defendants had and breached their duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products. Defendants also had and breached their duty to minimize the environmental harm caused by PFOA and PFOS. Moreover, Defendants failed to warn Plaintiff of the known risks for environmental and health hazards arising from the usage of AFFF containing PFOA and/or PFOS in its intended manner for its intended purpose.

17

**D.    THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S PROPERTY**

79. PFOA and PFOS have been detected in varying amounts, at varying times in water extracted from Plaintiff's water supply wells.  The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, in Plaintiff's property in varying amounts and at varying times has resulted, and will continue to result, in significant injury and damage to Plaintiff.

80. The invasion of Plaintiff's property with PFOA and PFOS is ongoing — new contamination flows regularly onto Plaintiff's property, resulting in new harm to the property and Plaintiff on each occasion.  Furthermore, the contamination prevents Plaintiff from fully utilizing its property, including its water rights.

81. The injuries and damages to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, the Plaintiff's property.  Plaintiff's interests in protecting its property constitute a reason for seeking damages sufficient to treat the contamination and restore such property to its pre-contamination condition.

82. As a direct result of Defendants' actions and omissions, Plaintiff has had to address PFAS contamination in its water supply and property.  In doing so, Plaintiff has incurred, and continues to incur, costs and damages related to the PFAS contamination of its water supply and property, including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet its water supply demands.

## FIRST CAUSE OF ACTION

### STRICT LIABILITY – DEFECTIVE DESIGN

83. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

84. Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and/or selling PFOS, PFOA, and products containing PFOS or PFOA, resulting in contamination of the environment, including the water that Plaintiff has water rights to and that serves as the water source for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

85. As manufacturers, designers, distributors, suppliers, sellers, and marketers of PFOS, PFOA, and/or products containing PFOS or PFOA, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

86. Defendants' PFAS products were defective in design and formulation when they left the hands of Defendants.

87. Defendants knew, or should have known, that use of AFFF in its intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into or onto land with associated migration to surface water and groundwater.

88. Defendants knew or should have known of the harmful and adverse impacts that exposure to its PFAS compounds would have on the environment and human health.

89. By causing PFAS contamination and the resulting impact to Plaintiff's public water supply system, Defendants engaged in marketing products that are not reasonably safe and are unreasonably dangerous, for which they are strictly liable.

90. As a result of Defendants' actions, Plaintiff has incurred, and will continue to incur, costs and damages related to the PFAS contamination of its water supply and property, including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet its water supply demands.

## SECOND CAUSE OF ACTION

### STRICT LIABILITY – FAILURE TO WARN

91. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

92. Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and/or selling PFOS, PFOA, and/or products containing PFOS or PFOA, resulting in contamination of the environment including, but not limited to, the water that serves as a water source for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

93. Defendants knew, or should have known, that use of AFFF in its intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into or onto land with associated migration to surface water, groundwater, and wastewater systems.

94. Defendants knew, or reasonably should have known, of the harmful effects and adverse impacts that exposure to its PFAS compounds would have on the environment and human health.

95. Defendants failed to provide warnings, labels, material safety data sheets, or instructions that were sufficient to notify the users of the dangers inherent in their products or of methods of use that could reduce or eliminate those dangers.

96. Defendants' failure to warn or adequately instruct regarding the dangers associated with the use of these products directly and proximately caused harm to Plaintiff.

97. As a result of Defendants' failure to warn, Plaintiff has incurred, and will continue to incur, costs and damages related to the PFAS contamination of its water supply and property, including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet its water supply demands.

## **THIRD CAUSE OF ACTION**

### NEGLIGENCE

98. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

99. Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and/or selling PFOS, PFOA, and products containing PFOS and/or PFOA.  As such, Defendants had a duty to exercise reasonable care in the manufacturing, distributing, selling, and marketing of their PFOA, PFOS and/or products containing PFOA and/or PFOS so as to avoid harm to those who would be foreseeably injured by PFAS environmental contamination.

100.     Defendants owed, and still owe, a duty to Plaintiff and Defendants breached that duty when they caused contamination to Plaintiff's property and water supply.

101.     Defendants knew, or should have known, that use of AFFF in its intended manner would result in the spillage, discharge, disposal, or release of PFOA and/or PFOS into or onto land with associated impacts to surface water and groundwater.

102.    Defendants knew, or reasonably should have known, of the harmful effects and adverse impacts that exposure to its PFAS compounds would have on the environment and human health.

103.    Defendants failed to exercise due care in the design, manufacturing, marketing and sale of PFOS, PFOA, and/or products containing PFOS and/or PFOA.  By failing to exercise this due care, Defendants breached their duty to avoid causing harm to Plaintiff.

104.    Furthermore, Defendants' conduct was willful and wanton and was committed with a reckless disregard to the rights of Plaintiff and the safety of others and the environment.

105.    As a result of Defendants' negligence, Plaintiff has incurred, and will continue to incur, costs and damages related to the PFAS contamination of its water supply and property, including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet its water supply demands.

## FOURTH CAUSE OF ACTION

### PRIVATE NUISANCE

106.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

107.    Defendants created and continue to cause a nuisance to Plaintiff by unreasonably and substantially interfering with Plaintiff's use and enjoyment of its property, including its water rights, by contaminating them with PFOS and PFOA.

108.    An unreasonable interference is one that is significant enough that a normal person in the community would find it offensive, annoying or inconvenient.  Conduct constituting a

nuisance may include indirect or physical conditions created by Defendants that cause Plaintiff harm.

109.    By Defendants' acts and omissions, Defendants' PFOS, PFOA, and/or products containing PFOS and/or PFOA have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its water supply system and the water sources that supply that system.

110.    Defendants have failed, and continue to fail, to abate the nuisance.

111.    Defendants knew, or reasonably should have known, of the harmful effects and adverse impacts that exposure to its PFAS compounds would have on the environment and human health.

112.    Defendants knew, or reasonably should have known, that their actions and omissions as described herein would cause injury and damage to the water supplying Plaintiff's public water supply system, thereby causing injury and damage to Plaintiff's property, including its water rights.

113.    Defendants' actions and omissions were performed knowingly, willfully, and with oppression, fraud and/or malice.  Furthermore, Defendants' actions and omissions were undertaken with a conscious disregard for the probable and foreseeable dangerous consequences of that conduct would have on the public and the environment.

114.    Defendants substantially interfered with Plaintiff's interests in the use and enjoyment of its property, including its water rights, by directly and proximately causing, and continuing to cause, the contamination of Plaintiff's property, including its water supply, with persistent, toxic chemicals.

115.    Due to the contamination by PFOS and PFOA, Plaintiff is unable to fully and completely utilize its property and has been compelled to forego the use of its valuable water rights.

116.    As a result of the nuisance, Plaintiff has incurred, and will continue to incur, costs and damages related to the PFAS contamination of its water supply and property, including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet its water supply demands.

## FIFTH CAUSE OF ACTION

### TRESPASS

117.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

118.    Plaintiff owns and operates a public water supply system in Colorado which includes, among other things, water supply wells that utilize groundwater to supply drinking water to the public.

119.    Plaintiff has not granted permission to Defendants to allow PFAS contamination to enter any of Plaintiff's property, including its water rights and water supply wells and Plaintiff's extensive infrastructure for collection, treatment and distribution of its water supply.

120.    Defendants knew, or reasonably should have known, that PFOS and PFOA are highly mobile and persistent in water, and readily move through surface and groundwater systems, thereby infiltrating groundwater aquifers and contaminating water supply wells, such as Plaintiff's, and threatening public drinking water supplies.

121.    Defendants have trespassed, and continue to trespass, on Plaintiff's property, including Plaintiff's water rights, by contaminating Plaintiff's property, including its water supply, with persistent, potentially toxic chemicals.

122.    Defendants' actions and omissions directly and proximately harmed Plaintiff, and each Defendant is jointly responsible for the trespass and injuries resulting therefrom.

123.    As a result of Defendants' actions and omissions, Plaintiff has incurred, and will continue to incur, costs and damages related to the PFAS contamination of its water supply and property, including but not limited to the investigation, monitoring, treatment, testing and remediation of the PFAS contamination, operating, maintenance and consulting costs, legal fees, and the past and potential future purchase of additional water supplies from Denver Water in order to meet its water supply demands.

## SIXTH CAUSE OF ACTION

### FRAUDULENT TRANSFER

124.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

125.    Plaintiff seeks equitable and other just and fair relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

126.    Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off DuPont's "performance chemicals" business in July 2015.

127.    At the time of the spinoff, DuPont's performance chemicals division contained the PFOA and/or AFFF business segments.  In addition to the transfer of the performance chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

128.    Upon information and belief, at the time of the transfer of its performance chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture, sale, and/or disposal of PFAS compounds and products that contain PFAS compounds.

129.    As a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

130.    Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as Plaintiff, that have been damaged as a result of the DuPont's actions described in this Complaint.

131.    Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that it would incur debts beyond Chemours' ability to pay as they became due.

132.    Plaintiff seeks to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

133.    Plaintiff further reserves such other rights and remedies that may be available to it as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged herein.

## DAMAGES

134.   As a result of the Defendants' actions and inactions as set forth and described herein, Plaintiff has sustained and will sustain the following damages, none of which are the fault of the Plaintiff:

    a.   past and future investigation and remediation costs;

    b.   past and future treatment-related capital and maintenance costs;

    c.   past and future testing, sampling and monitoring costs;

    d.   past and future loss of use of water rights;

    e.   past and future expenditures for the purchase of additional water;

    f.   past and future property damages;

    g.   loss of property value;

    h.   past and future consulting costs;

    i.   past and future legal fees;

    j.   pre and post-judgment interest; and

    k.   any and all other past and future costs and damages related to the contamination of its property as set forth and described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    a.   Enter judgment finding Defendants jointly and severally liable for all costs and damages incurred by Plaintiff as set forth herein, including but not limited to prior, interim and future capital as well as operation and maintenance costs related to PFAS contamination in Plaintiff's property, including its water rights; including the

reasonable costs of sampling, investigations, and assessment of injury, and destruction or loss resulting from PFAS contamination;

b.  Enter judgment finding Defendants liable for consequential damages;

c.  Enter judgment requiring, via injunction, Defendants to abate the nuisance they have created;

d.  Award Plaintiff the costs and reasonable attorney fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

e.  Award Plaintiff any other and further relief as this Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, the District demands a jury trial.

Dated: December 20th, 2019

Respectfully submitted,

Scott Summy
(Texas Bar No. 19507500)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181
Cary McDougal
(Texas Bar No. 13569600)
Carla Burke Pickrel
(Texas Bar No. 24012490)
Cristina Sanchez
(Texas Bar No. 24041856)

- and -

**COSSICH, SUMICH,
PARSIOLA & TAYLOR LLC**
8397 Highway 23, Suite 100
Belle Chasse, LA 70037-2648
Telephone: (504) 394-9000
Fax: (504) 394-9110
Philip F. Cossich, Jr.
(Louisiana Bar No. 1788)
Darren Sumich
(Louisiana Bar No. 23321)
David A. Parsiola
(Louisiana Bar No. 21005)
Brandon J. Taylor
(Louisiana Bar No. 27662)
Christina M. Cossich
(Louisiana Bar No. 32407)
Andrew J. Cvitanovic
(Louisiana Bar No. 34500)
Luana N. Smith
(Louisiana Bar No. 35534)

*Attorneys for Plaintiff*